In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-4074

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DONALD M. WOODS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 561—**Amy J. St. Eve,** *Judge.*

ARGUED JANUARY 8, 2009—DECIDED FEBRUARY 17, 2009

Before EASTERBROOK, *Chief Judge*, and EVANS and TINDER, *Circuit Judges*.

EVANS, *Circuit Judge.* Needing a getaway car for a bank robbery, Donald Woods borrowed one from a woman who bought drugs from him. Perhaps not the best choice—it had vanity license plates. Then he used part of the take from the robbery to retrieve a van he had borrowed from another woman. The second car had been impounded by the police when, while he was driving it the night before the robbery, he was cited for

operating a motor vehicle after his license was revoked and for illegal sound amplification. Not all that surprisingly, things went bad, and Woods was indicted and subsequently convicted after a jury trial of conspiracy to commit bank robbery and bank robbery. He was sentenced to 60 months in prison on the conspiracy charge and 160 months on the substantive charge, with the sentences to run consecutively. He appeals both the conviction and sentence.

At about 9:20 on an August morning in 2006, two masked men entered the NuMark Credit Union in Joliet, Illinois, and made off with $23,000. They left in the car Woods had borrowed from his drug customer, Aimee Sefcik, a car bearing the license plate AIMSEF6. Woods was driving. The Joliet Police Department began an investigation and two days later took one of the robbers, Christian Noel, into custody. Noel gave a written statement to detectives and later a videotaped confession. He also spoke to FBI agents. In each statement, he said he committed the robbery with Donald Woods and Anthony Jenkins, a/k/a/ Bonzo. His story about who did what—i.e., who drove the car and who went into the credit union—varied from time to time, but at Woods' trial he testified that he and Jenkins went into the credit union and Woods drove the getaway car.

Woods did not testify at trial, but he presented an alibi—a pretty good one as alibis go—as to his whereabouts on the morning of the robbery. The story begins the night before the robbery when Woods was driving a car registered to his girlfriend, Anita Robinson. Police

stopped him because the car radio was playing way too loud. As it turns out, he also had a revoked license. Officers had the car towed to Collision Revision in Joliet. As to the alibi, Robinson testified that she and Woods lived together, and the morning of the robbery they awoke between 9:30 and 9:45. They left the house, she said, at about 10 a.m. to try to borrow money from Woods' aunt in order to pay the fee to have the car released. She said Woods obtained $500, after which she and Woods drove to the police station to pay the fee. But because Robinson had not brought the title to the car with her, they had to go home to get it. They returned to the station at about 11 a.m. and paid the fee. The receipt is stamped 11:14 a.m. Their visits to the police station that morning were recorded by security cameras.

In addition to presenting his alibi witness, Woods also called a Quentin Reed, who met Noel when they were both incarcerated at the Dodge County Correctional Facility in Wisconsin. Noel told Reed that he had committed the robbery with two of his cousins. The point of the testimony was that "cousins" should be taken literally; Woods and Noel are not related; and therefore Woods could not have been one of the robbers.

A few more details of this improbable story will unfold as we discuss the issues Woods raises. He contends that the trial judge committed errors in the admission of evidence, that the evidence was not sufficient to sustain the conviction, that the judge improperly calculated the sentencing guidelines and did not consider the sentencing factors set out in 18 U.S.C. § 3553(a)(2),

and that there is unwarranted disparity between his sentence and the one his accomplice and codefendant, Noel, received.

We will first turn to the evidentiary rulings, which we review for an abuse of discretion. This general standard applies in the situations before us—where the evidence admitted is said to be "intricately related" to the charged offense, *United States v. Wantuch*, 525 F.3d 505, 517 (7th Cir. 2008), and where it involves a transcript of an audio recording. *United States v. Wilson*, 481 F.3d 475 (7th Cir. 2007). Even if there is an evidentiary mistake made by the trial court, we do not reverse if the error was harmless. *United States v. Bonty*, 383 F.3d 575 (7th Cir. 2004).

The first item of evidence Woods contends was improperly admitted was testimony that he provided drugs to Sefcik. Woods argued in the trial court that, if the jurors heard he sold drugs, they would conclude that he was a bad person and likely to participate in a bank robbery. The government contended that the evidence was intricately related to the charged offense in that it explained why Sefcik would give Woods her car. The evidence showed that Woods often used it and that on the day of the robbery he borrowed it on short notice without having to explain why he wanted it. The evidence explained why he could instruct Sefcik to lie for him and say that "'John' borrowed the car." We cannot find an abuse of discretion in the admission of the evidence. The fact that Woods sold drugs does not significantly increase the possibility that he would rob a bank.

Furthermore, the evidence fills a big gap by explaining why Sefcik would so willingly lend him her car even after he talked with her about robbing a bank.

Woods also contests the admission of the transcript of the recorded conversation between him and Noel. Three days after the robbery, Noel worked with police officers to place a telephone call to Woods, a call which was recorded. During the conversation, Noel asked what happened to Bonzo (Jenkins). Woods said that Bonzo left town and his whereabouts were known. Woods told Noel to stay off the telephone, but as soon as the call ended, Woods called Jenkins.

Woods contended that on the recording, his words were virtually impossible to understand. He was concerned that the inaudibility would mean that the jurors would not be able to evaluate the context of the conversation, the manner in which words were said, or the inflection of the voices and would therefore simply rely on the written transcript. The district judge examined the recording and the transcript *in camera*. At trial, the recording itself was admitted without objection. But when the government moved that the transcript be admitted, Woods objected, and a voir dire examination of Noel proceeded. Noel testified that he actively participated in the preparation of the transcript and that he could understand the words. The judge concluded that the objection went to the weight, not the admissibility, of the transcript. We see no abuse of discretion in the ruling.

The final piece of evidence Woods objects to is the testimony of William Tierney, an employee of NuMark.

Tierney had drawn a sketch of a man he had observed in the credit union the day before the robbery, ostensibly Woods. The man was talking on a cell phone. Because there was a policy prohibiting customers from using cell phones inside the credit union, Tierney asked the man to turn it off. The sketch Tierney later drew depicted a man with hair. Tierney also had been shown a photo array from which he identified Woods. But each man in the array was bald, and that, Woods argued, was unduly suggestive, and anything flowing from it was "fruit of the poisonous tree." At trial, Tierney identified Woods in the courtroom, and the prosecution made no mention of the sketch or the photo array. On cross-examination, the defense elicited testimony about both the sketch and the photo array and moved that the sketch be admitted into evidence. It was. On appeal, Woods argues that, because the person in Tierney's sketch had sideburns and at trial it was established that Woods had been bald for many years, Tierney's testimony that he had seen Woods in the lobby of the credit union the day before the robbery was unduly prejudicial. Whatever Woods' current objection is to Tierney's testimony, the matter is one for cross-examination, which is precisely the way it came before the jury. The jury was properly in a position to decide whether Tierney's testimony was worthy of belief or not.

We conclude that there were no evidentiary errors. But had there been, they would have been harmless. The testimony of codefendant and accomplice Noel about how the robbery went down was sufficient by itself to sustain the conviction.

Which brings us to the issue of the sufficiency of the evidence. A defendant faces a "nearly insurmountable hurdle" in challenging the sufficiency of the evidence to sustain a conviction. *United States v. Spells*, 537 F.3d 743, 746 (7th Cir. 2008). He must show that after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found him guilty beyond a reasonable doubt. *United States v. Stevens*, 453 F.3d 963 (7th Cir. 2006). We do not weigh the evidence or second-guess the jury's credibility determinations. *Id.* We uphold convictions based on uncorroborated testimony of an accomplice unless the testimony is incredible as a matter of law. *United States v. Van Wyhe*, 965 F.2d 528 (7th Cir. 1992).

Noel's testimony itself supports the conviction. He described the events leading up to the robbery, including his obtaining BB guns from his house. He testified that after the robbery Woods said he was going to use some of the money to get his "van out of the pound." Noel also testified about returning Sefcik's car to her house where he saw a short white woman with curly hair standing in the doorway. Sefcik's story was slightly different; she said Woods was alone when he returned her car. But differences such as this are for the jury to evaluate. Noel also testified that on the way to the robbery, Woods said that NuMark would be a good target because his "girl" cashes her checks there and says "there's no security." Robinson had, in fact, maintained an account at the NuMark for several years.

Sefcik testified that she had worked as an assistant bank manager at Harris Bank and two other banks. She said

that about a month before the robbery, Woods told her he was considering robbing a bank and asked her about security procedures in banks. She told him that simply by walking into a bank, a person could see whether it had security cameras or security guards. Woods also told Sefcik to lie if anyone asked who borrowed her car. Also, there is no question that Sefcik's car was the getaway car. Phone records also show a pattern of calls between Jenkins, Noel, and Woods and between Sefcik and Woods.

But what, one may ask, about the alibi? After all, twice the morning of the robbery Woods shows up on security tape from the police station. Even so, the alibi is far from airtight. Robinson testified only that when she awoke at between 9:30 and 9:45 that morning, Woods was there. The robbery was at 9:20. Evidence showed there was time for Woods to arrive home from the robbery by 9:34. Additionally, even if Robinson had said Woods was with her at 9:20, the jury was free to discredit her testimony in light of her relationship with Woods. She said she loved him; she lived with him; and they had two children together. There also was ample time after the robbery for him to arrive at the police station by 10 or 11 and again at about 11:15 when he and Robinson returned with the car title. In short, the evidence was sufficient to sustain the conviction.

Woods also raises issues regarding his sentence. He contends that the judge improperly calculated his offense level by treating him as a career offender. We review a determination that a defendant is a career offender *de novo*. *United States v. Billups*, 536 F.3d 574, 578

(7th Cir. 2008). The court's findings of fact are reviewed for clear error. *United States v. Samuels*, 521 F.3d 804, 815 (7th Cir. 2008). If the guideline calculation is correct, we then consider whether the sentence is reasonable.

Under the United States Sentencing Guidelines, a defendant is a career offender if he is at least 18 years old at the time of the crime, the offense of which he was convicted is a felony that is either a crime of violence or a controlled substance offense, and he had at least two prior felony convictions for a crime of violence or a controlled substance offense. U.S.S.G. § 4B1.2(a). Woods contests only whether he has two prior convictions.

One prior conviction on which the court relied was for a 1995 robbery. It was a class 2 felony under Illinois law punishable by three to seven years imprisonment. His sentence was 180 days in prison and a 30-month term of probation. Later his probation was revoked and he was sentenced to four years in prison. Woods argues that this robbery was not a crime of violence because he was not sentenced to more than a year. The argument cannot be sustained on the facts, given the four-year sentence ultimately imposed, and is simply wrong on the law. U.S.S.G. § 4B1.2 defines "crime of violence," in part, as "any offense under federal or state law, punishable by imprisonment for a term exceeding one year." As we said, this felony was "punishable" by a term of three to seven years.

The other prior conviction concerned a controlled substance offense. Woods says that because he was convicted of "possession" of a controlled substance, not of

manufacturing, importing, exporting, distributing, or dispensing a controlled substance as U.S.S.G. § 4B1.2(b) requires, the offense cannot be used to support a finding that he is a career criminal. The problem is that all records, including the indictment for the offense in Will County, Illinois, and the judgment and sentencing order, describe the offense as unlawful *delivery* of a controlled substance, a class 2 felony. There is no indication that the charge was ever reduced to simple possession. Woods' argument fails.

In another objection to the guidelines calculations, Woods contends that the judge improperly applied a 3-level sentencing enhancement for brandishing or possessing a dangerous weapon, pursuant to U.S.S.G. § 2B3.1(b)(2)(E). This argument also fails and, in any case, is futile. His status as a career offender increased his offense level to the point where this enhancement had no effect on the guideline range. But, regardless, the two BB guns would qualify as dangerous weapons. Woods claims, without reference to the record, that one of the guns was inoperable, but whether or not it was, the guns meet the definition in the comment to U.S.S.G. § 1B1.1(D). A gun is a dangerous weapon if it closely resembles a dangerous weapon or was used in a manner to create the impression that it was such. *See McLaughlin v. United States*, 476 U.S. 16 (1986).

Woods faults the district judge for a mere pro forma glance at the requirements of 18 U.S.C. § 3553(a). But we do not require that a district judge mention all the § 3553 factors, nor that she recite "magic words" at sentencing.

*United States v. Tyra*, 454 F.3d 686, 687 (7th Cir. 2006). Here, after listening to the parties and offering them an opportunity to speak, the judge discussed the nature and circumstances of the offense and Woods' history and characteristics, particularly his criminal record. The consideration of the § 3553(a) factors was adequate.

Woods complains that his sentence was dispropor-tionately longer than the 38-month term Noel received. However, we do not view a discrepancy between sen-tences of codefendants as a basis for challenging a sen-tence. *United States v. Omole*, 523 F.3d 691 (7th Cir. 2008). We look at a disparity only if it is between the defendant's sentence and all other similar sentences imposed nationwide. *United States v. Simpson*, 337 F.3d 905 (7th Cir. 2003). Furthermore, there are significant differences between Woods and Noel. Noel's only prior crimes at the time of sentencing were two misdemeanor convictions—one for stealing a pair of gym shoes and one for a traffic matter. Noel also entered a guilty plea, and his offense level was reduced by three levels for acceptance of responsibility. Additionally, Noel provided substantial assistance to the government. The disparity between these two sentences is not without justification.

Finally, Woods argues that the imposition of consec-utive sentences was improper. It is true that because the statutory maximum for the bank robbery was 240 months and Woods received 220 months, there was no need to impose consecutive sentences. On the other hand, it makes no difference whether the 220-month sentence grows out of consecutive sentences or whether

the sentence was 220 months on the bank robbery count with a concurrent sentence on the conspiracy count. The sentence does not pose the same problem as did the sentence in *United States v. Spells*, 537 F.3d 743 (7th Cir. 2008).

AFFIRMED.