In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2710

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

LARRY LUPTON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 07-CR-219—**Lynn Adelman**, *Judge.*

ARGUED JANUARY 13, 2010—DECIDED SEPTEMBER 1, 2010

Before BAUER, MANION, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Larry Lupton was a real estate broker assigned to facilitate the sale and leaseback of a building owned by the State of Wisconsin. In the course of soliciting bids for the sale, Lupton also solicited kickback payments from the broker for one of the competing prospective buyers—and claimed to have made similar overtures to others. In return for the payments, Lupton promised to crunch the numbers so that certain

proposals came out on top. The broker from whom Lupton sought a kickback reported the incident to the authorities and was outfitted with equipment to record his future dealings with Lupton. After the informant recorded several incriminating conversations with Lupton, FBI agents twice interviewed Lupton, who categorically denied any involvement in illicit activity. Notwithstanding Lupton's denials, a grand jury indicted him on four charges: corrupt solicitation, wire fraud, and two counts of making false statements to government officials. After a bench trial from which his proffered expert testimony was excluded, Lupton was found guilty of all four counts. He appeals both the exclusion of his expert's testimony and the validity of his convictions. We affirm in all respects.

## I.  Background

When the State of Wisconsin decided to sell and re-lease one of its buildings in early 2007, it entered into an exclusive listing agreement with real estate firm UGL Equis ("Equis"), with which it had a master contract dating back to 2004. Under the terms of the listing agreement, Wisconsin was to pay Equis a 4.3% commission on the expected $20-$30 million sale price. Equis designated one of its independent-contractor vice presidents, Larry Lupton, as one of two point persons for the sale. Lupton was tasked with soliciting proposals from parties interested in the deal, evaluating the bids, and recommending the top few to the State, who would then decide which proposal to accept. Under his contract with Equis, Lupton

would be paid a negotiable percentage—usually about 50%—of Equis's commission if he closed the sale.

In February 2007, Lupton sent out a memorandum soliciting proposals from prospective buyers and received a number of responses. Using an evaluation matrix that compared different features of the bids, Lupton identified some of the top proposals. In March, he contacted the bidders whose proposals rose to the top and asked them to submit final letters of intent ("LOIs") containing more detailed bid information. To assist the prospective buyers with the formulation of their LOIs, Lupton provided them with a sample LOI. The sample LOI contained a confidentiality clause, which most of the contenders imported into their final LOIs verbatim.

The prospective buyers submitted their LOIs in March, and on April 4, 2007, Lupton contacted Gabriel Silverstein, the broker for one of the top contenders, Chicago-based Zeller Realty Group. Lupton informed Silverstein that Zeller was a particularly strong contender for the purchase. He then told Silverstein that brokers for two of the other top contenders had offered to pay him a kickback in exchange for a strong recommendation to the State that it accept their bids. Lupton went on to explain that the proposed kickbacks were about one-quarter to one-half of the fee that the brokers expected to receive if the transaction went through, roughly one percent of the building's purchase price (which Lupton was supposed to ensure was in the range of $20-$30 million). Silverstein understood Lupton to be seeking a kickback of about $75,000.

Silverstein promptly reported the April 4 conversation to Wisconsin law enforcement authorities. Those authorities in turn contacted the FBI, and the FBI outfitted Silverstein and his telephone with recording devices and instructed him to arrange a meeting with Lupton. Silverstein met with Lupton on April 26, 2007, and told him that he wanted to "revisit another conversation that [Lupton] initiated about two weeks ago"—the April 4 conversation about kickbacks. Silverstein asked Lupton what he was expecting from Silverstein, and Lupton explained that he wasn't "making much money" at Equis, so he "talked to a couple of parties" who "already agreed to pay [him] between a quarter and a half point." Lupton continued, "I just want to make assurance . . . that if I could put you into that situation . . . that you guys can get me a quarter point."

Silverstein asked Lupton, "[H]ow would you envision doing that?" Lupton replied, "Take the taxes out and you . . . just give me . . . you know cash or check sort of thing or you could just allocate it as a consulting fee to a different company I have, which is NACO. North American Commercial Opportunities. . . . I mean, whatever way is . . . you know way is easier, I guess, you know." Lupton then clarified that "obviously I don't want anything in writing you know, 'cause you know, I don't want it leaked back to the State . . . or to Equis . . . ." Silverstein asked Lupton if he should "just come back up here and meet you or pay you separately? Is that what you're thinking?" to which Lupton responded, "Yeah. Yeah." He assured Silverstein that he was "not trying to get greedy," however. (Not greedy, perhaps, but self-inter-

ested all the same. Lupton expressed to Silverstein concern about Equis's—and thereby his own—take from the sale potentially getting halved, and evidence introduced at trial also showed that he had substantial gambling losses and minimal income to offset them.)

As the conversation continued, Silverstein asked Lupton how he planned to "make sure we're going to be your guys." Lupton explained that he would "make sure that you guys know the expectations of the State. I mean I got to just make sure that you guys are in line to be the top, you know, the top one or two . . . ." He told Silverstein, "I run the analysis and basically back you." "I mean as long as you guys come back in the right range . . . ." Lupton qualified his willingness to help Silverstein, despite his expressed preference to award the deal to a Midwestern firm like Zeller, informing him that "I got to do technically the right thing for the State." Yet Lupton went on to assure Silverstein that he would let him know if the other bidders' offers changed substantially so Zeller would have a chance to match or undercut the bids: "you guys can ah come back in and . . . match it." Lupton then told Silverstein the identities of the other bidders that remained in contention, as well as some of their proposed contractual terms that Zeller would have to match or beat. The two wrapped up their conversation by discussing some of the provisions that Zeller planned to include in its final proposal.

The next morning, Lupton telephoned Silverstein unexpectedly. Lupton gave Silverstein the details of the current best offer, a proposal submitted by a New Jersey

firm, Roebling Investments. The Roebling bid hadn't been finalized; it was verbal and Lupton hadn't even seen the written proposal yet. Lupton explained that he "wanted [Silverstein] to [have] a heads up" about the bid, and he promised to "let [Silverstein] know" Roebling's final numbers once he got them in writing. Lupton followed through on his promise on April 30, 2007, when he called to let Silverstein "know where the best LOI came back at." Lupton then provided Silverstein with the details of Roebling's updated bid, notwithstanding the confidentiality clause in Roebling's proposal, and told him that he would "call back here in a few hours" once everything was fully finalized.

Again true to his word, Lupton called Silverstein back later that evening. He confirmed that the Roebling bid was, as Silverstein put it, "in the same spot as before." He then told Silverstein that a bid from a California company, Arlen Capital, had come in via e-mail but that he had been unable to open the document on his cell phone. Lupton asked Silverstein to give him some time to review the Arlen bid and ended the call. Roughly twenty-five minutes later, Lupton called Silverstein back and reached Silverstein's voicemail. He left a detailed message about Arlen Capital's bid, and opined that Zeller's "only competition is really Roebling." He asked Silverstein to call him the next day so they could talk about the Arlen Capital bid and Zeller's final bid.

Silverstein didn't wait until the next day; he called Lupton back almost immediately. During this third April 30 phone call, Lupton said that Arlen Capital's bid

"doesn't make a whole lot of sense," and Silverstein expressed relief that nothing had changed. He explained to Lupton that it would have been "weird" if he had needed to call Zeller to encourage it to rework its final bid, which he stated he was only about fifteen minutes away from submitting to Lupton. (There is some evidence indicating that Zeller was given more time than its competitors to complete its bid.)

The next day, May 1, 2007, Lupton told Silverstein that he had presented his analysis of the bids to someone from the State. He claimed that he had "made the recommendations to . . . put your guys, you know, number one and then put Roebling number two." Lupton continued, "So I think you guys are there unless they make for drastic changes. . . . You should be okay." Lupton notified Silverstein that he would be meeting with the Wisconsin Secretary of State in a few days, and the Secretary would decide then which bid the State would accept. Lupton indicated that he had already provided Silverstein with the "transaction application forms" that he would need to fill out if Zeller was chosen as the buyer. Lupton also asked Silverstein to provide him with some background information on Zeller so he could "have it prepared" in case the Secretary of State asked him for it.

On May 10, 2007, a little more than a week after Lupton's last recorded conversation with Silverstein, and after state officials involved in the sale had been interviewed, FBI and Wisconsin Department of Justice special agents descended on Lupton's office to execute a search

warrant they had procured. Before searching Lupton's office, the agents asked Lupton a number of questions about his handling of the building sale. Lupton told the agents that he had never disclosed confidential bid information. He explained that bidders occasionally asked him if there was anything they could do to improve their chances, but that he always responded by providing general information and advice. The agents also asked Lupton about his expected compensation for the sale, and Lupton told them that he expected Equis alone to pay him; he did not mention any "commission splits," legitimate or otherwise. At the end of the interview, the agents again asked Lupton if he had ever provided a potential buyer with specific details from a competitor's proposal. Lupton reiterated that he had never done so. The agents advised Lupton not to contact anyone else involved in the sale.

Immediately after the agents left,[1] however, Lupton telephoned Silverstein. Lupton asked Silverstein, "out of curiosity," whether "the FBI . . . contacted you at all? On this . . . building?" Silverstein said, "FBI? Why?" Lupton explained that he wasn't sure what was going on but that he "got a couple . . . calls from them" and wasn't sure "if it['s] actually the FBI or who they you know state

---

[1] Terry Sparacino, the FBI special agent who executed the search warrant and interviewed Lupton, testified that before he and Wisconsin agent Dennis Drazkowski had even reached the parking lot of Lupton's building, they had already received a telephone call from Silverstein reporting that Lupton had called to ask about an FBI investigation. Tr. 138, Mar. 2, 2009.

they are." Silverstein asked what the callers had been saying, and Lupton said the calls were about "deal struc- tures that have been leaked out and you know so forth." Silverstein told Lupton he found that interesting. Lupton continued, "Somehow it got leaked out at some- place so I'm not sure from where." Lupton then ended the call so he could "check with some other parties to see what's going on."

On May 18, 2007, agents again interviewed Lupton, this time with his attorney present. Lupton again denied providing potential buyers with specific details from other bids. The agents also asked Lupton about seeking payments from potential buyers, and Lupton stated that it would be unusual for someone in his position to receive a share of the buyer's commission in the form of cash. The agents then asked Lupton about any such arrangement he might have had with Silverstein. Lupton initially responded that he did not recall any arrange- ment. Later on in the interview, however, he recalled that Silverstein had offered to pay him part of the buyer broker's commission. He said that if a cash payment had been mentioned, it had been by Silverstein. Lupton did not recall any mention of payment in the form of a check payable to NACO, his out-of-state shell corpora- tion. Again, he asserted that if anything like that had been discussed, Silverstein had broached the topic. Lupton made no mention of Wisconsin's brokerage stat- utes, or his conception of his duties thereunder.

A grand jury issued a four-count indictment against Lupton on August 14, 2007. Count I charged that between

April 4 and May 10, 2007, Lupton "corruptly solicited, demanded, and agreed to accept something of value from [Silverstein], intending to be influenced and rewarded in connection with a business, transaction, and series of transactions" involving the State of Wisconsin. 18 U.S.C. § 666(a)(1)(B). Count II alleged that Lupton "knowingly devised and participated in a scheme to defraud Equis and the State of Wisconsin of both property and the right of honest services," and used a telephone to do so, in violation of 18 U.S.C. §§ 1343 & 1346. Counts III and IV alleged that Lupton knowingly and willfully made false statements to the FBI agent who interviewed him. *See* 18 U.S.C. § 1001. The statement alleged to be false in Count III was Lupton's May 10, 2007, assertion that he had never provided prospective buyers with specific details from bids submitted by competing prospective buyers. The allegedly false statement cited in Count IV was Lupton's May 18, 2007, statement that he had never suggested to Silverstein that he pay Lupton in cash or by check payable to NACO.

Lupton did not take the charges sitting down. Over the course of the next several months, he filed various motions to dismiss the indictment, motions to suppress, and motions in limine, all of which the district court denied. Lupton also sought to present the testimony of real estate broker, attorney, professor, author, and former Wisconsin bureaucrat Martin Greenberg. Greenberg, Lupton asserted, would testify about the industry standards of practice governing commercial real estate brokers in Wisconsin, which Lupton claimed not only permitted him to engage in a "commission split" with

Silverstein but also required him to disclose the bid information he did.

After an evidentiary hearing concerning the propriety of Greenberg's testimony, the district court concluded that Greenberg's opinions were "based on his interpretation of state statutes and regulations and the contracts in this case, not his knowledge of general broker practices." *United States v. Lupton*, No. 07-CR-219, 2008 WL 2224399, at *1 (E.D. Wis. May 28, 2008). The district court excluded Greenberg's proposed testimony pursuant to *United States v. Caputo*, 517 F.3d 935 (7th Cir. 2008), explaining, "[T]he proposed testimony essentially amounts to legal interpretation, which is the province of the court . . . ." *Lupton*, 2008 WL 2224399, at *2; *see also id.* at *4 ("I will not permit a third party legal expert to, in effect, testify that defendant's conduct was lawful."). The district court also determined that Lupton failed to establish Greenberg's "knowledge, skill, experience, training, or education" in anything other than the law of real estate, *id.* at *2, and that Lupton further failed to demonstrate that Greenberg's opinions were based on sufficient facts and data and were the product of reliable principles and methods. *Id.* Additionally, the district court noted that the proffered testimony would likely "confuse rather than enlighten the jury" on the corrupt solicitation and wire fraud charges, *id.* at *3, and cited *United States v. Hasner*, 340 F.3d 1261, 1270 n.4 (11th Cir. 2003), for the proposition that Lupton's compliance with state law would be immaterial to one of the key issues, whether Lupton had the requisite intent to deprive Equis or the State of his honest services, *see id.* at *4.

In response to the district court's exclusion of Greenberg's testimony, Lupton petitioned this court for a writ of mandamus. His petition was denied, and, after renewing one of his motions to dismiss (it was again denied), Lupton proceeded to a bench trial in early March 2009. On March 16, 2009, the district court found Lupton guilty on all four counts. In its findings of fact and verdict, the court noted that "even considering Greenberg's testimony, the verdict would be the same." *United States v. Lupton*, No. 07-CR-219, 2009 WL 679649, at *8 n.11 (E.D. Wis. Mar. 16, 2009). Lupton promptly filed a motion for acquittal and a motion to arrest judgment, both of which the district court denied.

The district court sentenced Lupton to 24 months' imprisonment, concurrent on all counts. The district court also ordered 24 months of supervised release and a special assessment of $400.

## II. Discussion

Lupton now challenges the district court's exclusion of his expert's testimony as well as the validity of all four of his convictions. (He does not contest his below-Guidelines sentence.) With respect to Count I, he argues that the evidence did not establish that he was an "agent" for purposes of 18 U.S.C. § 666, the statute under which he was convicted. Also with respect to Count I, he contends that the district court erred in concluding that the proposed payment was not a bona fide commission split outside the purview of the statute. *See* 18 U.S.C. § 666(c). As for Count II, Lupton claims that his

information-sharing behavior cannot form the basis of a federal offense because it was legal under state law. He argues that his convictions under Counts III and IV were improper because his statements to the FBI agent were not knowingly and willfully made because he thought the conduct underlying them was legal and were not material because they had no real effect on the FBI's investigation.

## A. Exclusion of Expert Testimony

Lupton contends that the district court erred in excluding Greenberg's testimony. His principal claim is that Greenberg's testimony, which was intended to illuminate "broker conduct relative to 'honest services fraud,'" was "relevant opinion evidence by a qualified expert" that should have been admitted. We are not persuaded that the district court abused its discretion in concluding otherwise.

Federal Rule of Evidence 702 governs the admissibility of expert testimony, as does the Supreme Court's seminal case of *Daubert v. Merrell Dow Pharmaceutials, Inc.*, 509 U.S. 579 (1993). Rule 702 by its terms allows the admission of testimony by an "expert," someone with the appropriate "knowledge, skill, experience, training, or education" to help the trier of fact "understand the evidence or determine a fact in issue." Fed. R. Evid. 702. Experts are only permitted to testify, however, when their testimony is (1) "based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and

methods reliably to the facts of the case." *Id. Daubert* requires the district court to act as an evidentiary gate-keeper, ensuring that Rule 702's requirements of reliability and relevance are satisfied before allowing the finder of fact to hear the testimony of a proffered expert. *See Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Jenkins v. Bartlett*, 487 F.3d 482, 488-89 (7th Cir. 2007). We give district courts wide latitude to make their evidentiary determinations: we review whether they applied the *Daubert* framework de novo, but we review their ultimate conclusions as to the admissibility of expert testimony only for abuse of discretion. *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009).

There is no question that the district court adhered to the *Daubert* framework here. It requested briefing on the issue and held a two-and-a-half hour hearing to determine whether Greenberg was "qualified to testify in the case in question and whether his testimony is scientifically reliable." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). At that hearing, Greenberg offered his interpretations of various Wisconsin statutes and Lupton's contract with Equis. He opined that Lupton's sharing of proposal terms was "prescribed and sanctioned by statute." Tr. 28, Mar. 20, 2008. He also characterized Lupton's "commission splitting" conversation with Silverstein as "a proper conversation . . . one that was normal with respect to the way brokers conduct their business." *Id.* at 44. On cross-examination, Greenberg conceded that he had not held a real estate broker's license for thirty years, had never participated in a com-

petitive bid transaction like the one at issue here, and had no personal experience with the statutes he was interpreting. He also had the following exchange with the district court:

> Court: And your conclusions about Mr. Lupton's activity are based on your interpretation of the statute, then, as filtered through these articles. Is that a fair assessment or not?

> Greenberg: I've made my conclusion based upon what he did compared to what the statute permits and requires him to do.

> Court: So you're saying that as you read the statute what he did was legal under the statute.

> Greenberg: That's exactly what I've testified here today.

*Id.* at 70.

After the hearing, the court issued a decision and order excluding Greenberg's testimony. The district court rested its determination on Greenberg's lack of relevant expertise and experience, the absence of facts or data underlying his opinions, the fact that what he was really offering was legal interpretation, and the danger that extensive testimony about the meaning of state statutes would confuse the jury. (Lupton had not yet waived his right to be tried by a jury.)

The first two rationales rest upon the firm ground of Rule 702, which governs the admissibility of expert testimony even in federal criminal trials. *Cf. Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have

an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence."). Greenberg's thirty-year distance from the day-to-day goings-on in the brokerage world and lack of experience with the statutes and contract at issue in this case call into question the extent to which his "knowledge, skill, experience, training, or education" qualify him to render an opinion on what constitute "innocent, normal, and acceptable practices," Appellant's Br. 42, among real estate brokers. And Greenberg's lack of methodology—he simply read the statutes and discussed how he thought they might apply—as well as the absence of any data—such as how Wisconsin courts have applied the statutes, or how often situations such as Lupton's arise—support the district court's second Rule 702 finding that Greenberg's testimony was insufficiently reliable to be admitted.

Even if Greenberg had been qualified as an expert, however, the district court would still have been within its discretion to exclude his legally interpretive testi- mony under the third and fourth rationales it provided. The court was correct in noting that the meaning of statutes, regulations, and contract terms is "a subject for the court, not for testimonial experts. The only legal expert in a federal courtroom is the judge." *Caputo*, 517 F.3d at 942 (citation omitted); *see also United States v. Stewart*, 433 F.3d 273, 311 (2d Cir. 2006) ("Clearly, an opinion that purports to explain the law to the jury trespasses on the trial judge's exclusive territory."). Greenberg's exchange with the court demonstrates that he was acting—and even saw himself as—nothing more

than a legal expert. Moreover, the legal interpretations he was providing related not to the statutes Lupton was charged with violating but rather to state statutes. Those statutes were relevant to Lupton's defense, that what he did was legal under state law, but they were tangential to the crucial questions the factfinder had to answer, namely whether the government could prove beyond a reasonable doubt the elements of 18 U.S.C. §§ 666, 1343 & 1346. Testimony about them would have been of limited value at best and unduly confusing at worst; the district court did err in concluding that it fell nearer the latter end of that spectrum. *See* Fed. R. Evid. 403.

Lupton's other unsupported complaints about the exclusion of Greenberg's testimony do not merit discussion.

## B. Challenges to Convictions

### 1. Count I: Corrupt Solicitation

#### a. Lupton was an "Agent"

Lupton was indicted for violating 18 U.S.C. § 666(a)(1)(B), which prohibits "an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof" from "corruptly solicit[ing] or demand[ing] for the benefit of any person, or accept[ing] or agree[ing] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government or agency in-

volving any thing of value of $5,000 or more." Section 666(d)(1) defines an "agent" as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." Lupton argues that he should not have been found guilty under 18 U.S.C. § 666 because he was not an "agent" as defined in subsection (d)(1). He contends that he does not meet the definition of "agent" because there is a provision in the contract between the State of Wisconsin and Equis that explicitly denies Equis any authority to act on behalf of the State. He also contends, apparently in the alternative, that the record was devoid of evidence that he was authorized to act on behalf of the State of Wisconsin. We find both these arguments wanting.

Lupton's first contention starts out accurately enough: the 2004 master contract between Equis and the State of Wisconsin included the State's "supplemental standard terms and conditions for procurements," one of which stated that Equis "shall act in the capacity of an independent contractor and not as an officer, employee, or agent of the state." This contractual requirement extended recursively to "each subcontractor of the contractor, [who] will be deemed to be an independent contractor and will not be considered or permitted to be an agent . . . of the state." Therefore, Lupton asserts, neither he nor Equis could possibly be considered an "agent" under § 666(d)(1). That is where his argument falls off the rails. Whether Lupton is considered an "agent" for purposes of 18 U.S.C. § 666 is determined by that statute,

not by the terms of a private contract. Parties cannot contract around definitions provided in criminal statutes; even if Lupton could not be considered a common law agent under Equis's contract, it is nonetheless possible for him to be an "agent" under the terms of 18 U.S.C. § 666(d)(1). *Cf. United States v. Ortiz-Santiago*, 211 F.3d 146, 152 (1st Cir. 2000) (noting that the sentencing "safety valve" is a congressional directive that the government cannot use plea agreements to circumvent). The statutory definition of "agent" is an expansive one. *See United States v. Sotomayor-Vázquez*, 249 F.3d 1, 8 (1st Cir. 2001). As the Sixth Circuit put it, privately agreed upon "employment labels," like the "independent contractor" one Lupton purportedly wore here, "may bring some employment relationships *within* the sphere of agency status but they do not necessarily squeeze all other employment relationships *out* of that sphere." *United States v. Hudson*, 491 F.3d 590, 595 (6th Cir. 2007); *see also United States v. Vitillo*, 490 F.3d 314, 323 (3d Cir. 2007) (noting that § 666(d)(1) "is, by its own plain language, not exhaustive" and concluding that "independent contractors" may well fall within its ambit). The question we must answer, then, is the one implicated by Lupton's second argument: did the government provide enough evidence at trial to support the factfinder's conclusion that Lupton was the State's "agent" as defined in 18 U.S.C. § 666(d)(1)? *See Hudson*, 491 F.3d at 595.

We start off our exploration of this question by noting that Lupton faces a steep uphill climb here. *See, e.g.*, *United States v. Woods*, 556 F.3d 616, 621 (7th Cir. 2009) ("A defendant faces a 'nearly insurmountable hurdle' in

challenging the sufficiency of the evidence to sustain a conviction."). For Lupton to prevail, we must be convinced, after viewing the evidence in the light most favorable to the government, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* In making our inquiry, we do not reweigh the evidence or second-guess the factfinder's credibility determinations. *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009).

The factfinder concluded that Lupton was authorized to act on behalf of the State in connection with the sale of the building and was therefore an "agent" for purposes of 18 U.S.C. § 666. Ample evidence supports that conclusion. Lupton sent out an offering memorandum soliciting proposals from prospective buyers. His name was on the cover page, right along with the State of Wisconsin's. The memorandum provided that "[a]ll requests for additional information" were to be directed to Lupton or another Equis vice president and warned potential buyers that contacting the State through other channels could result in the termination of any agreement. Lupton was responsible for further communications with potential buyers, he knew the State's expectations, and he kept the State apprised of his efforts to get the bidders to make better offers. Like the defendant in *Hudson*, Lupton was authorized "to perform all duties, responsibilities, and necessary actions required to market" the building, *Hudson*, 491 F.3d at 594, and served as prospective buyers' "primary contact" for negotiations with the State, *id.* Perhaps most tellingly, Lupton told Silverstein that he was obligated "to do technically

the right thing for the State." On this record, a rational factfinder could readily conclude that Lupton had authority to act on behalf of the State and was thus an "agent" as defined in 18 U.S.C. § 666(d)(1).

### b. The Proposed Transaction was not a Bona Fide Transaction

Lupton also argues that even if he is considered an "agent," his conviction under 18 U.S.C. § 666 is invalid for another reason: the discussions he had with Silverstein were in his view proposals for a bona fide business transaction. He rests this contention on 18 U.S.C. § 666(c), which states that § 666 "does not apply to bona fide salary, wages, fees, or other compensation paid, or expense paid or reimbursed, in the usual course of business." Lupton maintains that what he wanted to engage in with Silverstein was legitimate "commission splitting" permitted by Wisconsin law, and, moreover, that he and Silverstein only discussed the "split" hypothetically. The district court rejected this contention and found that Lupton's "unusual maneuvering" with Silverstein "reveals that this was not to be a payment in the ordinary course of business." *Lupton*, 2009 WL 679649, at *5. The evidence was sufficient to support the factfinder's conclusion. *See United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007) ("Whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide.").

Regardless of whether commission splitting is permissible under Wisconsin law, the record here is replete

with evidence supporting the finding that this particular "split" was neither bona fide nor sought in the ordinary course of business. Foremost, when discussing the payment with Silverstein, Lupton never referred to the "hypothetical" payment as a "split," and always emphasized that it was for him alone. For instance, he told Silverstein, "I just want to make assurance . . . that if I could put you into that situation . . . that you guys can get me a quarter point." He also stated that "a couple of parties . . . already agreed to pay me between a quarter and a half point." Likewise, when Silverstein asked Lupton how he envisioned the commission split happening, Lupton did not say that he would get consent from Equis or the State in writing (which is required by Wis. Stat. § 452.133(3)). To the contrary, he explicitly told Silverstein that he didn't "want it leaked back to the State or you know, to Equis." He also assured Silverstein that he would be "close lipped" about the whole thing. He proposed that Silverstein could "take the taxes out and . . . just give me cash or check." Lupton suggested that Silverstein could alternatively "allocate it as a consultant fee to a different company I have which is NACO. North American Commercial Opportunities."

As the government points out in its brief, "[c]ash payments, payments to sham companies, and mischaracterization of payments are hallmarks of concealment and fraud." Appellee's Br. 18; *cf. United States v. Boscarino*, 437 F.3d 634, 636 (7th Cir. 2006) ("Corporate insiders don't keep half of bona fide referral fees, nor are such fees paid from an insider's personal account after such a roundabout transaction."). To be sure, Terry Sparacino, the

FBI agent who interviewed Lupton, testified that Lupton acknowledged that the receipt of cash (or payment to a defunct corporation) would not generally be part of a legitimate commission split. Tr. 139, Mar. 2, 2009. Silverstein, whose testimony the district court credited over Lupton's, testified that commission splits between brokers were common, but "[t]his situation was one where it was made very clear to me from the onset that commissions were not being shared," and "I've never in my career been approached that way." *Id.* at 68-69. Additionally, according to Sparacino, Lupton never indicated that he was engaging in a commission split with any buyer, nor did he inform Sparacino of his supposed belief that what he had proposed was legal under Wisconsin law. *See id.* at 136-40.

### 2. Count II: Wire Fraud

In Count II, the government alleged that Lupton devised and participated in a scheme to defraud Equis and the State of property and the right of honest services, and that he transmitted a wire communication from Wisconsin to Illinois in furtherance of that scheme. *See* 18 U.S.C. §§ 1343, 1346. The district court unambiguously concluded that the government proved that Lupton was guilty of wire fraud under both alternative theories, deprivation of property and of honest services, beyond a reasonable doubt. *Lupton*, 2009 WL 679649, at *6 ("The government in this case alleged both a scheme to obtain money and to deprive Equis and the State of

honest services. The government proved the defendant guilty beyond a reasonable doubt under both theories.").

Lupton argues that he "cannot be convicted of 'honest services fraud' (Count Two) under 18 U.S.C. § 1346 for disclosing the terms of competing proposals to parties to a real estate transaction because that conduct is expressly allowed," or even required, by Wisconsin's real estate and open records statutory schemes. Appellant's Br. 17. He contends that his conviction therefore "violates fundamental principals [sic] of federalism and impermissibly creates a federal common law crime." *Id.* at 18.

These arguments leave much to be desired, not least some discussion of federal rather than state law, but it's not what Lupton argues that dooms him: it's what he doesn't. The district court found Lupton guilty of wire fraud under both theories posited by the government: the traditional theory outlined in 18 U.S.C. § 1343, which the government dubs "straight property," Appellee's Br. 20, and the alternative theory defined by § 1346, honest services. Yet, as the government rightly points out, Lupton's arguments indisputably pertain only to the latter type, not the former.[2] *Cf. United States*

---

[2] In his reply brief, Lupton claims that he has consistently challenged both theories supporting his wire fraud conviction. Reply Br. 7. An exiguous mention in one's introductory "statement of the case" does not a developed argument make, however. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.

(continued...)

*v. Blagojevich*, No. 10-2359, 2010 WL 2778838, at *1 (7th Cir. July 12, 2010) ("[I]f you lose for two independent reasons an appellate victory on one does not affect the judgment."). Lupton has therefore forfeited any challenge to his conviction for mine run wire fraud, *United States v. Boyle*, 484 F.3d 943, 946 (7th Cir. 2007), which would stand in any event because the evidence is sufficient to support it, *cf. United States v. Turner*, 551 F.3d 657, 665-66 (7th Cir. 2008) (upholding a general verdict of guilty for violations of 18 U.S.C. §§ 1343 & 1346 where evidence supporting the so-called "straight property" variant was sufficient), *cert. denied*, 129 S. Ct. 2748 (2009). Specifically, the government's evidence proved (1) that Lupton participated in a scheme to defraud Equis out of part of the commission it was legally due, (2) acted with the intent to defraud Equis ("obviously I don't want anything in writing you know, 'cause you know, I don't want it leaked back to the State . . . or to Equis . . . ."), and (3) transmitted an interstate wire communication in furtherance of his scheme. 18 U.S.C. § 1343; *Turner*, 551 F.3d at 664; *Lupton*, 2009 WL 679649, at *6-*8. That would be adequate to support Lupton's wire fraud conviction even if the district court had issued a general verdict. *See Turner*, 551 F.3d at 665-66.

---

[2] (...continued)
1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim."); *cf. Bradshaw v. Miners' Bank*, 77 F. 932, 933 (7th Cir. 1897) (expressing displeasure with appellants' brief because its "so-called 'statement of the case' is burdened and confused with matter of argument").

Lupton's state-law-grounded arguments challenging the honest services prong of his wire fraud conviction get him no further.[3] Lupton argues that he did not commit what he terms "honest services fraud" because Wisconsin real estate and open records laws permit or require him to disclose the intimate details of prospective buyers' bids to one another. As a threshold matter, we note that we have some reservations about Lupton's characterization of the statutes to which he points. For instance, he informs us that "Wis. Stat. § 452.139(1) specifically provides that the provisions of Chapter 452 supercede [sic] any common law duties or obligations" of real estate brokers. Appellant's Br. 27. But a closer look at the statute reveals that it goes on to limit its superseding reach "to the extent that those common law duties or obligations are inconsistent with the duties specified in this chapter or in rules promulgated

---

[3] The same is true of his Fed. R. App. P. 28(j) submission regarding the recent Supreme Court companion cases *Skilling v. United States*, 561 U.S. ___, No. 08-1384, 2010 WL 2518587 (June 24, 2010), and *Black v. United States*, 561 U.S. ___, No. 08-876, 2010 WL 2518593 (June 24, 2010). We have carefully reviewed those cases and conclude that they do not change the outcome of this one. Specifically, we conclude (a) that Lupton's scheme constitutes not a mere failure to disclose a conflict of interest, *see Skilling*, 2010 WL 2518587, at *28, but rather the "paradigmatic kickback fact pattern," *id.* at *27, that remains within the ambit of § 1346, *see United States v. Cantrell*, ___ F.3d ___, No. 09-1856, 2010 WL 3155912, at *1 (7th Cir. Aug. 11, 2010), and (b) that *Black* is inapposite to this case, which involved neither a general verdict nor jury instructions.

under this chapter." Wis. Stat. § 452.139(1). Likewise, the Wisconsin Supreme Court has explicitly undermined Lupton's interpretation of Wisconsin's open records law, Wis. Stat. §§ 19.31-19.39, explaining that the statutes "clearly envision[ ] a public entity, a quasi-governmental corporation, or a governmental entity, not an independent contractor hired by such a public or governmental entity, as being the 'authority' [from whom information may be requested] for purposes of the open records law." *WIREdata, Inc. v. Vill. of Sussex*, 2008 WI 69 ¶ 74, 310 Wis.2d 397, 438, 751 N.W.2d 736, 755-56.

Even if the state laws read as Lupton says, though, his arguments misapprehend the nature of his conviction. They speak only to the alleged propriety of his information-sharing with Silverstein and do not address the elements of wire fraud. Lupton was convicted of scheming (with the aid of a wire communication) to deprive Equis and the State of Wisconsin of his honest services. 18 U.S.C. §§ 1343 & 1346. That is, he solicited a kickback from Silverstein to advance Zeller's interests in the bidding process and harmed Equis and Wisconsin intangibly by doing so. *See Skilling v. United States*, 561 U.S. ___, No. 08-1384, 2010 WL 2518587, at *24, *28 (June 24, 2010). Whether he was allowed to share the information he shared with Silverstein is not the guiding consideration; one can perform a perfectly legal act in a corrupt way or as a means to achieve a more sinister goal. Indeed, the information divulged to Silverstein was a pawn in Lupton's broader scheme, the quo Lupton exchanged for Silverstein's quid; the information sharing was not, as he would have it, the

basis of his conviction. *See Lupton*, 2009 WL 679649, at *7 ("Further, defendant's disclosure of specific bid information did not occur in a vacuum—defendant disclosed Roebling's LOI terms to the same broker from whom he sought a monetary kickback."). What supports Lupton's conviction is substantial evidence showing the existence, intent, and advancement of his scheme, not the precise means by which he planned to carry it out.

It is likewise unimportant that this case comes on the heels of another case out of the Eastern District of Wisconsin, *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007), in which we reversed the federal bribery and mail fraud convictions of a Wisconsin bureaucrat because the proof at trial demonstrated, at worst, minor deviations from Wisconsin's administrative procedure rather than federal crimes. There, the government's entire case rested on the premise that "any politically motivated departure from state administrative rules is a federal crime, when either the mails or federal funds are involved." *Thompson*, 484 F.3d at 878. "Neither Thompson nor anyone else in state government was accused of taking a bribe or receiving a kickback." *Id.* at 881. Here, the government alleged and proved the elements of the federal crime of wire fraud as described in §§ 1343 & 1346; it did not make a federal case out of a minor dereliction of state-imposed duties. And, more importantly, Lupton's conduct, unlike Thompson's, placed him squarely within even the recently narrowed parameters of § 1346. *See Skilling*, 2010 WL 2518587, at *27-*28. Lupton's attempt to liken the two cases—rooted in his argument about federal common law crimes—consequently proves unsuccessful.

We also note that any attempt to minimize the "bribe-and-kickback" nature, *Skilling*, 2010 WL 2518587, at *28, of Lupton's scheme by emphasizing its lack of completion is equally unavailing. The wire fraud statutes criminalize the fraudulent acts undertaken to secure illicit gains, not their ultimate successes. *See United States v. Capoccia*, 503 F.3d 103, 112 (2d Cir. 2007) (noting that some "criminal statutes . . . define offenses either as actions taken pursuant to a scheme to defraud or as such schemes themselves" and including among these 18 U.S.C. §§ 1341 & 1343); *cf. United States v. White*, 610 F.3d 956, 960 (7th Cir. 2010) (discussing the inchoate crime of solicitation). So it's not pertinent that the plot was foiled long before Lupton received any kickback, nor that Lupton recommended Roebling's bid, not Zeller's, to a member of Wisconsin's Department of Administration. (There is evidence in the record indicating that Lupton "unexpectedly and 'out of the blue' made a pitch for" Roebling to this individual, Peter Maternowski, and Lupton's counsel gave us the same information at oral argument.) In any event, it's not necessarily the case that Lupton failed to live up to his promises to Silverstein. The recommendation he made was not to the final decisionmaker, and he himself indicated that he had similar deals with other bidders—he may have been recommending different bids at different points to satisfy the terms of these other alleged deals or to mitigate any appearance of inappropriately favoring one bidder over the others. While the fact that Lupton recommended Roebling may pique the interest of law enforcement officials, it does nothing to alter the validity of his wire fraud conviction in this case.

### 3. Counts III & IV: False Statements to FBI Agent

Lupton's third and fourth convictions both stemmed from 18 U.S.C. § 1001, which makes it a crime to knowingly and willfully make a materially false statement in connection with a matter within the jurisdiction of a federal agency, here, the FBI. *See United States v. Ringer*, 300 F.3d 788, 791 (7th Cir. 2002). Count III was predicated upon Lupton's May 10, 2007, assertion to FBI Agent Sparacino that he had never provided prospective buyers with specific details from bids submitted by competing prospective buyers. Count IV rested on Lupton's May 18, 2007, claim to FBI Agent Sparacino that he had never suggested to Silverstein that he be paid in cash or by check payable to any company other than Equis. The district court found that Lupton knowingly and willfully made both these statements in the course of a matter within the jurisdiction of the United States, and that the statements were false and material. Lupton claims the statements were not "knowingly" and "willfully" made because he had a good faith belief that the conduct he was denying was legal. Lupton also claims that the district court erred in its determination that the statements were "material," because the statements had no actual effect on the investigation: FBI agents already had in their possession the tapes of Lupton and Silverstein's conversations when they questioned Lupton. In his reply brief, he also argues that his statements constituted an "exculpatory no" and thus could not serve as a basis for liability.

Lupton contends that his statements could not have been made knowingly or willfully because he believed

in good faith that he was obligated to disclose bid details to competing bidders and that he was engaging in legitimate commission splitting negotiations. But the "knowingly and willfully" requirement in 18 U.S.C. § 1001 relates only to the defendant's knowledge and intent that the statements he made to a government entity were false or were made with the conscious purpose of evading the truth. *United States v. Dick*, 744 F.2d 546, 553 (7th Cir. 1984). It has nothing to do with the legality of the underlying conduct about which the defendant spoke. Lupton told the agents that he never disclosed specific information from prospective buyers' bids to other prospective buyers. That statement did not concern his ability or lack thereof to disclose the information; the issue was whether he disclosed it. Like the agent to whom he was speaking, Lupton knew he had disclosed specific information from Roebling's proposal to Silverstein and therefore had to know that his statement to the contrary was false. Similarly, Lupton knew that his statement about never having discussed payments made directly to him or to NACO was false when he made it, for he had recently engaged in a lengthy, in-person conversation with Silverstein about that very topic. Lupton never told the agents about his alleged beliefs that his conduct was legal. He didn't say something like, "Yes, I shared those details, but I thought I was required to by Wisconsin law." To the contrary, he flatly denied ever sharing bid information or discussing payments to NACO. And given the ample evidence that he was aware he had in fact done those very things, we cannot conclude that the district court clearly erred.

We likewise hold that district court did not clearly err in concluding that both of Lupton's statements filled the materiality bill. To be "material" for purposes of 18 U.S.C. § 1001, a statement "must have a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed." *Turner*, 551 F.3d at 663 (quotation omitted). We do not require the statement to *actually* influence the agency to which it was directed, or even that the agency rely on the statement in any way. *See id.*; *United States v. Burke*, 425 F.3d 400, 409 (7th Cir. 2005) ("That the prosecutors knew (or thought they knew) the answers to the questions they asked Burke does not make the information less material."); *United States v. Ranum*, 96 F.3d 1020, 1028 n.12 (7th Cir. 1996) ("[I]t is not necessary for an allegedly false statement to have any ill effect at all, as long as it is capable of having such an effect."). Instead, we have recognized, like many of our sister circuits, that a frequent aim of false statements made to federal investigators is to cast suspicion away from the declarant, "which in the ordinary course would have an intrinsic capability . . . to influence an FBI investigation." *Turner*, 551 F.3d at 664.; *see id.* at 663-64 (collecting cases). When statements are aimed at misdirecting agents and their investigation, even if they miss spectacularly or stand absolutely no chance of succeeding, they satisfy the materiality requirement of 18 U.S.C. § 1001.

Lupton's May 10 statement that he never shared specific bid details from prospective buyers with other prospective buyers could only have been designed to cast suspicion away from him, with respect to both his

relationship with Silverstein and any similar arrangements he might have had with other prospective buyers. If the agents hadn't had the tapes of Lupton divulging the contents of Roebling's and Arlen's bids to Silverstein, Lupton's statement might reasonably have caused them to turn their attention away from him. That is enough for a factfinder to conclude that the statement was material; it is of no moment that the agents did have the tapes and that the statement thus had no actual impact on the investigation. And the May 18 statement, in which Lupton denied ever suggesting that Silverstein pay him in cash or pay NACO by check, was also of the type that would naturally tend to influence the course of the agents' investigation. Indeed, Agent Sparacino testified that he came away from the interview with a sense that Lupton was trying to deflect the agents' focus from him. Tr. 141, Mar. 2, 2009.

Lupton forfeited his "exculpatory no" argument by raising it for the first time in his reply brief. *See Boyle*, 484 F.3d at 946. But even if he hadn't, the argument would be without traction because the Supreme Court has clearly held that "the plain language of § 1001 admits of no exception for an 'exculpatory no.'" *Brogan v. United States*, 522 U.S. 398, 408 (1998); *United States v. Brandt*, 546 F.3d 912, 917 (7th Cir. 2008) ("In *Brogan*, the Supreme Court explicitly and unequivocally rejected the 'exculpatory no' doctrine as a defense to criminal liability under § 1001."). And in any event, Lupton said much more than "no" during his two interviews with the FBI, so this isn't a situation in which one could even reasonably advocate for the resurrection of the defunct

"exculpatory no" doctrine. Lupton chose to lie to Agent Sparacino, and he must live with the consequences of that choice. *Burke*, 425 F.3d at 409.

## III. Conclusion

For the foregoing reasons, we AFFIRM the challenged evidentiary ruling, findings, and verdicts of the district court.