*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0243p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

No. 05-2656

*v.*

JOSEPH HUDSON,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-80394—Victoria A. Roberts, District Judge.

Argued: June 5, 2007

Decided and Filed: June 26, 2007

Before: NORRIS, GILMAN, and SUTTON, Circuit Judges.

────────────────

**COUNSEL**

**ARGUED:** Harold Z. Gurewitz, GUREWITZ & RABEN, Detroit, Michigan, for Appellant. John C. Engstrom, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Harold Z. Gurewitz, GUREWITZ & RABEN, Detroit, Michigan, for Appellant. John C. Engstrom, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

────────────────

**OPINION**

────────────────

SUTTON, Circuit Judge. Joseph Hudson challenges his conviction and sentence for fraudulently obtaining more than $200,000 from the River Rouge School District. We affirm.

I.

In August 1998, the River Rouge School District, located in Wayne County, Michigan, hired Joseph Hudson to help it develop a television station for the high school. Hudson, a friend of River Rouge Superintendent Benjamin Benford, signed two employment contracts with the district as an independent contractor—one in August 1998, one in January 1999. Under the second contract, Hudson "agree[d] to perform all duties, responsibilities and necessary actions required to market, develop and consult in the development of RPS-TV/35 productions." JA 201.

While performing the contracts, Hudson stole more than $200,000 from the district through three separate schemes. The first one started in 1998, when Hudson hired Lonzell Hatcher to paint

signs and a set for the school district's television studio and for its athletic field. Hudson prepared the invoices for the projects, decided how many hours Hatcher had worked on them and set inflated prices for the work. After the school district paid the invoices, Hudson gave the checks to Hatcher, who cashed them, then split the money with Hudson, who ultimately received $33,137.

In the summer of 1999, Hudson promised Leon Higgins $5000 to help him pull off the second scheme. After Hudson signed and submitted five phony invoices from Ideal Communications—a pager and cell phone company owned by Higgins' sons—the district issued a check for $81,323 to the company. Higgins deposited the check in his bank account, withdrew the cash and gave it (minus $5000) to Hudson. Hudson also signed and submitted six additional fake invoices from Ideal Communications the following year, this time obtaining a check from River Rouge Schools for $82,501. Higgins again deposited the check, withdrew the cash and kept $5000 for himself before giving the rest to Hudson.

Meanwhile, Hudson was busy carrying out the third scheme. In 1999 and 2000, he provided the district with phony invoices on letterhead from Trio Lumber Company, a legitimate business but one that did not know about, let alone authorize, the purported purchases. When the invoices reached the desk of River Rouge's chief finance director, Marie Miller, she noticed that Hudson had not followed district procedures for the purchases. She shared her concerns with Superintendent Benford, who told her to pay the invoices anyway.

All three schemes began to unravel when a new development aroused Miller's suspicions. In September 2000, Don Bilinski, one of the teachers responsible for the televison studio, approached Miller and asked her for permission to repair some of the equipment. Miller explained that the district "had a cash flow problem" and told him to use the new equipment detailed in the invoices Hudson had recently submitted. JA 366. Bilinski responded that the studio had not received any new equipment.

On October 2, 2000, Miller sent a memo to Superintendent Benford, explaining that "Mr. Hudson requested a total of $81,322.50 of equipment from Ideal Communications in 1999 and $82,500.99 of equipment in 2000 for a total of $163,823.49 over two years. No one in the district has seen the equipment." JA 223. Miller also sent a certified letter to Hudson, asking him to contact her about setting up a meeting to discuss the missing equipment.

On October 13, Miller met with Hudson, Bilinski and the superintendent's secretary to search the studio for the equipment. After they could find only 60% of the equipment, Hudson told them that the rest was at the football stadium. Miller, Bilinski and two other school officials searched the stadium but could not locate the missing equipment.

Miller sent another memo to Superintendent Benford, expressing "grave concerns" about the situation. JA 226. When Benford failed to launch an investigation, Miller contacted the school district's attorney.

After an investigation determined that Benford and Hudson had swindled the school district, a federal grand jury indicted the two men for conspiracy to defraud the school district and eventually indicted Benford for extortion. *See* 18 U.S.C. §§ 371, 666(a)(1). Benford pleaded guilty to a charge of extortion, in return for which the district court dismissed the fraud charges against him. A jury convicted Hudson of three fraud charges. Hudson received a 38-month sentence and was ordered to pay $204,279 in restitution.

## II.

Hudson contends that the district court erred (1) in refusing to dismiss the indictment, (2) in denying his motion for acquittal and (3) in applying the abuse-of-a-position-of-trust enhancement in calculating his sentence.

### A.

In challenging the sufficiency of the indictment, Hudson argues that it failed to explain why he was an agent of the school district, violating the notice requirements of the Sixth Amendment and Federal Criminal Rule 7(c)(1). *See also* 18 U.S.C. § 666(a)(1). Rule 7(c)(1) requires an indictment to include "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *see also United States v. Vanover*, 888 F.2d 1117, 1121 (6th Cir. 1989).

The elements of a fraud charge under § 666 consist of the following: (1) a defendant must be an agent of the organization or local government agency receiving federal funding; (2) the defendant must embezzle, steal or fraudulently obtain property; (3) the property must be valued at $5000 or more; (4) the organization or local government agency must own or control the property; and (5) the organization or local government agency must receive more than $10,000 in federal funding. 18 U.S.C. § 666(a); *see also United States v. Valentine*, 63 F.3d 459, 462 (6th Cir. 1995). Hudson takes issue with the indictment's treatment of the first element of the crime—his agency status—arguing that the indictment does not allege sufficient facts to show that he acted as an agent for the school district.

Count one of the indictment says that Hudson was "hired by the River Rouge Schools to consult and assist in matters pertaining to a local television studio," and was "an agent of the River Rouge Schools and was authorized to act on behalf of the" school district. Second Superseding Indict. at 2. The indictment then supplies details—dates, circumstances of his employment, false invoices—about the criminal allegations, amply putting Hudson on notice of the charges against him. *See, e.g., id.* (stating in count one of the indictment that "[o]n or about June 29, 1999 . . . Hudson presented five false invoices . . . . The five invoices, in total, billed the River Rouge Schools $81,322.50 for television equipment that was never provided."); *id.* at 31 (stating in count three of the indictment that "[o]n or about July 14, 2000 . . . Hudson, acting as an agent of the River Rouge Schools, did knowingly embezzle, steal, obtain by fraud . . . River Rouge Schools funds in the amount of $82,500.99"); *id.* at 31 (stating in count four of the indictment that "[b]etween December 4, 1999 and July 6, 2000 . . . Hudson, acting as an agent of the River Rouge Schools, did knowingly embezzle, steal, obtain by fraud . . . River Rouge Schools funds in the amount of $7,322.00 by submitting false and fraudulent invoices from 'Trio Lumber'").

Hudson persists that counts three and four of the indictment are defective because they do not spell out the details of the agency relationship—because in particular they do not mention or incorporate by reference the allegations of consulting and assisting contained in count one and instead simply track the language of the statute. But an indictment that recites statutory language in describing the offense "is generally sufficient . . . as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Hamling*, 418 U.S. at 117 (internal quotation marks omitted); *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001) ("An indictment is usually sufficient if it states the offense using the words of the statute itself, as long as the statute fully and unambiguously states all the elements of the offense."); *see, e.g., United States v. Branan*,

457 F.2d 1062, 1064 (6th Cir. 1972) (finding in a conspiracy case that a "reference to a specific section of [a] statute[] was sufficient to meet the test that the indictment must sufficiently apprise the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, that the record show with accuracy to what extent he may plead a former acquittal or conviction").

Not only does the indictment generally satisfy these modest requirements, but it also specifically makes the description of Hudson's agency relationship in count one applicable "[a]t all times material to this indictment." Second Superseding Indict. at 1. The district court correctly denied Hudson's motion to dismiss the indictment.

B.

In challenging the district court's denial of his motion for judgment of acquittal, Hudson argues that the government did not show that he was an agent of the school district, as required to bring him within the compass of the federal anti-fraud statute. An "agent," the statute says, is "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1). While the statute makes the title given to an employment relationship a sufficient condition for establishing agency status—"servant," "employee," "partner, director, officer, manager, and representative" all will suffice in the case of an organization or government—it does not make the name given to a relationship a necessary condition for establishing agency status. That the two contracts between Hudson and the school district describe him as an "independent contractor" thus does not resolve the inquiry; the statute says only that the definition of agent "includes" the itemized employment relationships, not that it consists of them and them alone. The question remains whether Hudson satisfies the statute's general definition of an agent—whether Hudson was "authorized to act on behalf of" the school district.

Ample evidence allowed the jury to conclude just that. The two contracts gave Hudson broad authority to set up a television station in the high school. They authorized Hudson "to perform all duties, responsibilities and necessary actions required to market, develop and consult in the development of RSP-TV/35," to "assist[] with the training of students and/or District employees" in using the television studio and to "perform[] all other such duties and responsibilities as fall[] within the purview of the positions specified" in the contract. JA 201.

Testimony from school officials underscored Hudson's authority to act on the district's behalf. Marie Miller testified that Hudson "served as a representative" for the school district, JA 331, operated as the district's contact person for the purchase of videotapes, studio sets and stadium signs, brokered a lease for River Rouge on Xerox equipment and organized a golf fundraiser that benefitted the district. Lonzell Hatcher added that Hudson was his "primary contact" with River Rouge, that Hudson negotiated the price the district would pay for Hatcher's signs and that Hudson created the invoice for the work. JA 493, 495. The school district provided Hudson with a desk, supplied him with his own telephone and phone extension and gave him a master key to the high school and the district's gym. Hudson had business cards bearing the school district's logo and address. Miller even "questioned whether he should be put on the payroll as an employee" because "he was doing things and being given the responsibilities or the authority to do things that are normally given to an employee." JA 393. Consistent with this authority, Hudson initiated purchase orders on behalf of the district. *See, e.g.*, JA 303.

It is fair game to point out, as Hudson does, that we have never considered the application of this statute to an independent contractor. But he is wrong to contend that his title as an independent contractor by itself insulates him from prosecution. Employment labels, as we have

shown, may bring some employment relationships *within* the sphere of agency status but they do not necessarily squeeze all other employment relationships *out* of that sphere. The question remains whether employment relationships not specifically mentioned in the statute nonetheless involve authority "to act on behalf of another," and nothing about this case and the evidence presented by the government precluded the court from letting the jury decide this question.

Other courts have taken the same approach, with many of them upholding prosecutions of independent contractors and consultants with less authority than Hudson possessed. *See, e.g.*, *United States v. Sotomayor-Vazquez*, 249 F.3d 1, 8 (1st Cir. 2001) (finding consultant qualified as an agent and interpreting § 666 "to include persons who *act* as directors, managers, or representatives of covered organizations"); *United States v. Vitillo*, No. CRIM. 03-555, 2005 WL 1693932, at *4 (E.D. Pa. July 19, 2005) ("Given the breadth of the statutory definition of agent, an independent contractor may certainly be considered an agent for the purposes of § 666."); *United States v. Toro*, No. 89 CR. 0268, 1989 WL 63118, at *1–2 (S.D.N.Y. June 8, 1989) (defendant, an independent contractor, who was hired by a school district as a student recruiter and who "misappl[ied]" school funds, deemed an agent of the district); *cf. United States v. Phillips*, 219 F.3d 404, 413 (5th Cir. 2000) (finding no agency relationship between a Louisiana parish tax assessor and the parish itself because the assessor "was not an employee or officer of the parish and because he was not authorized to act on behalf of the parish with respect to its funds"). As a matter of legal custom and tradition, moreover, nothing about the title independent contractor invariably precludes someone from being an agent under appropriate circumstances. *See* Restatement (Second) of Agency § 2(3) ("An independent contractor . . . may or may not be an agent."); *see also Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 219 (6th Cir. 1992) (noting that "a person may be both an independent contractor and an agent"). On this record, a rational jury could find that Hudson had authority to act on behalf of the school district.

C.

Hudson also argues that he did not occupy a position of trust and that the district court thus should not have enhanced his sentence under § 3B1.3 of the guidelines. A position of trust is one of "professional or managerial discretion." U.S.S.G. § 3B1.3 app. n.1 (explaining that people holding positions of trust "ordinarily are subject to significantly less supervision" than those who hold positions featuring "non-discretionary" responsibilities). It is appropriate to apply the enhancement, the Sentencing Commission tells us, when the defendant's "position of public or private trust . . . contributed in some significant way to facilitating the commission or concealment of the offense." *Id.* And "the level of discretion accorded an employee is to be the decisive factor" when deciding if an employee holds a position of trust. *United States v. Tribble*, 206 F.3d 634, 637 (6th Cir. 2000).

Hudson's employment with the district amounted to a position of trust: He had authority to "develop" a television station for the high school, which included authority to purchase expensive television equipment; he assisted students and staff in their use of the television studio; and he advised the district on matters involving the studio. JA 201; *see United States v. Gilliam*, 315 F.3d 614, 616–17 (6th Cir. 2003) (affirming application of enhancement to a *part-time* drug and alcohol counselor who worked for a company that contracted with the United States Probation Office because he "was without question employed in a position of considerable trust").

In arguing that § 3B1.3 cannot apply because abuse of trust "is an aspect of and included in the specific offense" he committed, Reply Br. at 13; *see* U.S.S.G. § 3B1.3 ("This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic."), Hudson overlooks contrary case law. *See United States v. Brown*, 66 F.3d 124, 129 (6th Cir. 1995) (finding abuse of trust is not "a necessary element of the crime of embezzlement" under 18 U.S.C. § 666(a)(1) because the government "did not have to prove the degree of

independence and discretion that the enhancement provision requires"); *United States v. Madison*, Nos. 05-5622, 05-5625, 05-5825, 05-5826, 2007 WL 1120382, at \*12 (6th Cir. Apr. 16, 2007) (holding district court erred in finding that abuse of trust was "fairly subsume[d]" within conviction under 18 U.S.C. § 666 and therefore erred in not applying § 3B1.3 enhancement to defendant).

That Hudson did not receive advance notice of the district court's decision to apply § 3B1.3 does not help him either. While case law requires notice before a district court departs or varies from the recommended guideline sentence, *see Burns v. United States*, 501 U.S. 129, 138 (1991) (departure); *United States v. Quinlan*, 473 F.3d 273, 280 (6th Cir. 2007) (variance), they do not require notice when a district court interprets the guidelines differently from the probation officers—when it applies "the Guidelines in a manner different from what is recommended in the presentence report," *United States v. Hayes*, 171 F.3d 389, 393 (6th Cir. 1999); *see also United States v. Guthrie*, 144 F.3d 1006, 1012 (6th Cir. 1998) (determining no notice required when the district court applied an enhancement for offenses involving fraud or deceit, even though the probation department did not recommend the enhancement in the presentence report); *United States v. Thomas*, No. 05-6246, 2007 WL 1310162, at \*5 (6th Cir. May 4, 2007) (finding no notice owed to defendant when district court decided to apply obstruction-of-justice enhancement).

III.

For these reasons, we affirm.